IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| TRAVIS BESAW, DONNA BRANHAM, BEN BRATCHER, BARBARA CAMPBELL, THERESA CARROLL, BILLY JOE COLEMAN, DANNY EVANS, ELLEN GLATMAN, DORRIS JORDAN, MELANIE MILLER, DOROTHY NASEEF, LARRY KEN PIERCE, MELANIE STINSON, BLAKE TAYLOR, RONDAL TURNER, and KRISSY WILKINSON, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs | ) | |
| v. | ) ) | |
| AMERIDOSE, LLC, MEDICAL SALES MANAGEMENT, INC., MEDICAL SALES MANAGEMENT SW, INC., GDC PROPERTIES MANAGEMENT, LLC, ARL BIO PHARMA, INC. D/B/A ANALYTICAL RESEARCH LABORATORIES, BARRY J. CADDEN, GREGORY CONIGLIARO, LISA CONIGLIARO CADDEN, DOUGLAS CONIGLIARO, CARLA CONIGLIARO, GLENN A. CHIN, SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC, HOWELL ALLEN CLINIC A PROFESSIONAL CORPORATION, JOHN CULCLASURE, M.D., DEBRA SCHAMBERG, R.N., SAINT THOMAS WEST HOSPITAL formerly known as ST. THOMAS HOSPITAL, SAINT THOMAS NETWORK and SAINT THOMAS HEALTH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. JURY DEMAND |
| Defendants. | ) | |

COMPLAINT

Plaintiffs, Travis Besaw, Donna Branham, Ben Bratcher, Barbara Campbell, Theresa

Carroll, Billy Joe Coleman, Danny Evans, Ellen Glatman, Dorris Jordan, Melanie Miller,

Dorothy Naseef, Larry Ken Pierce, Melanie Stinson, Blake Taylor, Rondal Turner, and Krissy Wilkinson, for their cause of action against the Defendants, respectfully state to the Court as follows:

## INTRODUCTION

1. This lawsuit arises as a result of a widespread outbreak of fungal meningitis over the past year that has affected people in at least 20 states and caused over 60 deaths. Over 700 people have been diagnosed with meningitis and/or fungal infections.

2. The United States Food and Drug Administration ("FDA") and the Centers for Disease Control ("CDC") have identified fungus present in several separate lots of preservative-free injectable steroids, specifically methylprednisolone acetate (sometimes referred to as "MPA"), that was compounded and distributed by New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC") as the cause of the fungal meningitis outbreak and the resulting injuries and deaths.

3. Multiple vials of steroids compounded at NECC have been recalled but the recall was too late for the Plaintiffs and for many others who have suffered serious and, at times, catastrophic injuries.

4. During the period of June 2012 through August 2012, Saint Thomas Outpatient Neurosurgical Center, LLC, ("Saint Thomas Neurosurgical") purchased approximately two thousand five hundred (2,500) 80 mg. vials of MPA from NECC and then sold and administered the MPA to patients, including the Plaintiffs.

5. From June through September 2012, the Plaintiffs received lumbar epidural steroid injections ("ESI") at Saint Thomas Neurosurgical. During those procedures the anesthesiologist injected MPA into the Plaintiffs' backs. To the best belief and knowledge, the

2

dates that each of the Plaintiffs received ESIs at Saint Thomas Neurosurgical are outlined in Exhibit 1.

6. The Plaintiffs' ESIs came from contaminated lots of MPA that Saint Thomas Neurosurgical purchased from NECC. The contaminated lots were subsequently recalled by NECC.

7. The Plaintiffs' injections of MPA caused them various injuries and medical conditions including, but not limited to, fungal meningitis, localized spinal or paraspinal infections (i.e. epidural abscesses, arachnoiditis, phlegmon, etc.), anxiety, depression, and complications associated with lumbar punctures. The Plaintiffs' injections of MPA also caused them to undergo various unnecessary and painful medical treatments but for the ESI injections including, but not limited to, lumbar punctures, blood patches, hospitalizations, MRIs, and CT scans.

PARTIES

8. Plaintiff, Travis Besaw, is a citizen and resident of Warren County, Kentucky and resides at 121 Rosie Street, Bowling Green, Kentucky 42103.

9. Plaintiff, Donna Branham, is a citizen and citizen and resident of Metcalfe County, Kentucky and resides at 9388 Edmonton Road, Summer Shade, Kentucky 42166.

10. Plaintiff, Ben Bratcher, is a citizen and citizen and citizen and resident of Edmonson County, Kentucky and resides at 500 Coy Road, Roundhill, Kentucky 42275.

11. Plaintiff, Barbara Campbell, is a citizen and citizen and resident of Lyon County, Kentucky and resides at 508 Magnolia Drive, Kuttawa, Kentucky 42055.

12. Plaintiff, Theresa Carroll, is a citizen and citizen and resident of Edmonson County, Kentucky and resides at 7769 Blackgold Road, Sweeden, Kentucky 42285.

3

13. Plaintiff, Billy Joe Coleman, is a citizen and resident of Logan County, Kentucky and resides at 8334 Lewisburg Road, Lewisburg, Kentucky 42256.

14. Plaintiff, Danny Evans, is a citizen and resident of Warren County, Kentucky and resides at 195 Tanglewood Trail, Bowling Green, Kentucky 42101.

15. Plaintiff, Ellen Glatman, is a citizen and resident of Warren County, Kentucky and resides at 1702-A Park Street, Bowling Green, Kentucky 42101.

16. Plaintiff, Dorris Jordan, is a citizen and resident of Warren County, Kentucky and resides at 149 London Drive, Bowling Green, Kentucky 42104.

17. Plaintiff, Melanie Miller, is a citizen and resident of Monroe County, Kentucky and resides at 202 Woodhaven Drive, Tompkinsville, Kentucky 42167.

18. Plaintiff, Dorothy Naseef, is a citizen and resident of Hart County, Kentucky and resides at 910 Raider Hollow Lane, Munfordville, Kentucky 42765.

19. Plaintiff, Larry Ken Pierce, is a citizen and resident of Hart County, Kentucky and receives his mail at P.O. Box 623, Eddyville, Kentucky 42038.

20. Plaintiff, Melanie Stinson, is a citizen and resident of Hart County, Kentucky and resides at 306 West Dale Heights, Horse Cave, Kentucky 42749.

21. Plaintiff, Blake Taylor, is a citizen and resident of Warren County, Kentucky and resides at 1776 Colesbend Road, Smiths Grove, Kentucky 42171.

22. Plaintiff, Rondal Turner, is a citizen and resident of Monroe County, Kentucky and resides at 760 R. Turner Road, Tompkinsville, Kentucky 42167.

23. Plaintiff, Krissy Wilkinson, is a citizen and resident of Warren County, Kentucky and resides at 198 Greta Drive, Alvaton, Kentucky 42122.

4

24. Defendant Ameridose, LLC, ("Ameridose") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with a principal place of business at 205 Flanders Road, Westborough, Massachusetts 01581. The managers of Ameridose are Gregory Conigliaro and Barry Cadden. Ameridose's registered agent is Gregory Conigliaro.

25. Defendant Medical Sales Management, Inc., ("MSM") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director of MSM. Barry Cadden is the Treasurer and a Director of MSM. Gregory Conigliaro is the Secretary and a Director of MSM. MSM's registered agent is Gregory Conigliaro.

26. Defendant Medical Sales Management SW, Inc., ("MSMSW") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director, Barry Cadden is the Treasurer and a Director, Gregory Conigliaro is the Secretary and a Director and Lisa Conigliaro Cadden is a Director. MSMSW's registered agent is Gregory Conigliaro.

27. Defendant GDC Properties Management, LLC, ("GDC") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 701 Waverly Street, Framingham, Massachusetts 01702. GDC's manager and registered agent is Gregory Conigliaro.

28. Defendant ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories ("ARL") is an Oklahoma corporation organized and domesticated under the laws of the State of

5

Oklahoma with a principal place of business at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma 73104. Thomas C. Kupiec is the Chief Executive Officer and registered agent of ARL.

29. Defendant Barry J. Cadden ("Barry Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093, and a citizen and resident of the Commonwealth of Massachusetts. Barry Cadden is the President of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"), which is a Massachusetts corporation. At least until October 2012, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Barry Cadden is a founder and Manager of Ameridose and was involved in Ameridose's day-to-day operations. Barry Cadden is the Treasurer and Director of MSM and MSMSW.

30. Defendant Gregory Conigliaro ("Gregory Conigliaro") is an individual residing at 1 Mountain View Drive, Framingham, Massachusetts 01701, and a citizen and resident of the Commonwealth of Massachusetts. Gregory Conigliaro is a principal owner and the general manager of NECC, as well as NECC's Treasurer, Secretary, Vice President, registered agent, and one of its Directors. Gregory Conigliaro provided financial advice, oversaw day-to-day operations, and regularly appeared in the NECC facility. Gregory Conigliaro is the founder and a Manager of Ameridose and involved in Ameridose's day-to-day operations. Gregory Conigliaro is Secretary and Director of MSM and MSMSW.

31. Defendant Lisa Conigliaro Cadden ("Lisa Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093, and a citizen and resident of the Commonwealth of Massachusetts. Lisa Cadden is a board member, Director and, at least until

6

October 2012, a pharmacist at NECC. Lisa Cadden, upon information and belief, compounded drugs and was involved in the day-to-day operations of NECC.

32. Defendant Douglas Conigliaro ("Douglas Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026, and a citizen and resident of the Commonwealth of Massachusetts. Douglas Conigliaro is the President and a Director of MSM and MSMSW. Douglas Conigliaro, upon information and belief, is involved in the day-to-day operations of NECC, Ameridose, MSM, and MSMSW.

33. Defendant Carla Conigliaro ("Carla Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026, and a citizen and resident of the Commonwealth of Massachusetts and is a Director of NECC.

34. Defendant Glenn A. Chin ("Glenn Chin") is an individual residing at 173 Mechanic Street, Canton, Massachusetts 02021, and a citizen and resident of the Commonwealth of Massachusetts. At least until October 2012, Glenn Chin was a pharmacist at NECC. Glen Chin, upon information and belief, compounded drugs at NECC.

35. Defendant Saint Thomas Outpatient Neurosurgical Center, LLC, ("Saint Thomas Neurosurgical") is a Tennessee for-profit limited liability company organized and domesticated under the laws of the State of Tennessee. Saint Thomas Neurosurgical's principal place of business is located on the 9th floor of the Medical Plaza East office building on the Saint Thomas Hospital campus at 4230 Harding Pike in Nashville, Davidson County, Tennessee 37205. Saint Thomas Neurosurgical's registered agent for service of process is Gregory B. Lanford, M.D., 2011 Murphy Avenue, Suite 301, Nashville, Tennessee 37203.

36. Defendant Howell Allen Clinic A Professional Corporation, ("Howell Allen Clinic") is a Tennessee professional corporation organized and domesticated under the laws of

7

the State of Tennessee with its principal place of business in Nashville, Davidson County, Tennessee. Howell Allen Clinic's registered agent for service of process is Gregory B. Lanford, M.D., 2011 Murphy Avenue, Suite 301, Nashville, Tennessee 37203.

37.     Defendant John Culclasure, M.D., ("Dr. Culclasure") is an individual residing at 1510 Demonbreun Street, Unit 1208, Nashville, Tennessee 37203 and a citizen and resident of the State of Tennessee. During all relevant times, Dr. Culclasure was an employee of the Howell Allen Clinic and the Medical Director of Saint Thomas Neurosurgical. Dr. Culclasure is a medical doctor and practices in the specialty of anesthesiology. Dr. Culclasure was involved in the day-to-day operations at Saint Thomas Neurosurgical.

38.     Defendant Debra Schamberg, R.N., ("Ms. Schamberg") is an individual residing at 2644 Mossdale Drive, Nashville, Tennessee 37217, and a citizen and resident of the State of Tennessee. During all relevant times, Ms. Schamberg was an employee of Howell Allen Clinic and the Facilities Director of Saint Thomas Neurosurgical. Ms. Schamberg is a registered nurse and was involved in the day-to-day operations at Saint Thomas Neurosurgical.

39.     Defendant Saint Thomas West Hospital ("St. Thomas Hospital") is a Tennessee non-profit corporation organized and domesticated under the laws of the State of Tennessee with its principal place of business located on the Saint Thomas West Hospital campus at 4220 Harding Pike in Nashville, Davidson County, Tennessee. Saint Thomas West Hospital was formerly known as St. Thomas Hospital. Saint Thomas West Hospital's registered agent for service of process is E. Berry Holt III, Suite 800, 102 Woodmont Boulevard, Nashville, Tennessee 37205.

40.     At all times while providing treatment to Plaintiffs at Saint Thomas Neurosurgical, the physicians, nurses, staff, and other personnel were agents, apparent agents,

8

employees or representatives of St. Thomas Hospital and were acting within the course and scope of their employment, agency, or apparent agency with St. Thomas Hospital.

41. Pursuant to the doctrine of *respondeat superior*, St. Thomas Hospital is vicariously liable for any negligent acts and omissions of their employees, agents, or representatives committed in the course and scope of their employment or agency while treating Plaintiffs.

42. Defendant Saint Thomas Network is a Tennessee non-profit corporation organized and domesticated under the laws of the State of Tennessee with its principal place of business located on the St. Thomas Hospital campus at 4220 Harding Pike in Nashville, Davidson County, Tennessee. Saint Thomas Network's registered agent for service of process is E. Berry Holt III, Suite 800, 102 Woodmont Boulevard, Nashville, Tennessee 37205.

43. Defendant Saint Thomas Network was formerly known as Saint Thomas Health Services.

44. Saint Thomas Network is a successor of Saint Thomas Health Services.

45. Saint Thomas Network, as the successor of Saint Thomas Health Services, is a manager of Defendant Saint Thomas Neurosurgical.

46. Saint Thomas Network, as the successor of Saint Thomas Health Services, is an owner and/or member of Defendant Saint Thomas Neurosurgical.

47. Defendant Saint Thomas Health is a Tennessee non-profit corporation organized and domesticated under the laws of the State of Tennessee with its principal place of business in Nashville, Davidson County, Tennessee. Saint Thomas Health's registered agent for service of process is E. Berry Holt III, Suite 800, 102 Woodmont Boulevard, Nashville, Tennessee 37205.

9

48. Defendant Saint Thomas Health was formerly known as Saint Thomas Health Services.

49. Saint Thomas Health is a successor of Saint Thomas Health Services.

50. Saint Thomas Health, as the successor of Saint Thomas Health Services, is a manager of Defendant Saint Thomas Neurosurgical.

51. Saint Thomas Health, as the successor of Saint Thomas Health Services, is an owner and/or member of Defendant Saint Thomas Neurosurgical.

52. Defendants Saint Thomas Network and Saint Thomas Health are hereinafter referred to collectively as "Saint Thomas."

53. At the time of the events described herein, Defendants Saint Thomas and Howell Allen Clinic acted in concert to operate jointly the Defendant Saint Thomas Neurosurgical.

54. The individuals and entities described in paragraphs 24–34 are sometimes collectively referred to as the "NECC Related Defendants."

55. The individuals and entities described in paragraphs 35–53 are sometimes collectively referred to as the "Tennessee Defendants."

## JURISDICTION AND VENUE

56. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1334(b) because as described herein each claim asserted herein is related to a case under title 11.

57. This case is related to the NECC Bankruptcy because the outcome of the proceeding certainly could have some effect on the bankruptcy estate.

58. On December 21, 2012, NECC filed a petition for Bankruptcy protection under Chapter 11 of the Bankruptcy Code: In re: New England Compounding Pharmacy, Inc., Debtor,

10

United States Bankruptcy Court for the District of Massachusetts Case No. 12:19882 HJB. A United States Trustee was subsequently appointed to administer the Bankruptcy Estate.

59. NECC has express contractual indemnification obligations to among others, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, GDC, and MSM. Some, if not all, of the aforementioned individuals are insured under NECC's insurance policies.

60. Adversarial cases seeking recovery of damages for the benefit of the bankruptcy estate and its unsecured creditors have been or will be filed in NECC's bankruptcy against each of the NECC Related Defendants.

61. Lawsuits alleging death or injury based on contaminated MPA have been filed around the country. On February 12, 2013, the Judicial Panel on Multidistrict Litigation (MDL No. 2419) issued an order under 28 U.S.C. § 1407 transferring various federal court proceedings to the United States District Court for the District of Massachusetts for coordinated or consolidated pretrial proceedings. The transferred actions are pending in the United States District Court for the District of Massachusetts in the Multidistrict Litigation action styled: In re: New England Compounding Pharmacy, Inc. Products Liability Litigation, United States District Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS. The transferred cases have been assigned to the Honorable F. Dennis Saylor, United States District Judge, for pre-trial proceedings and coordination.

62. The Bankruptcy Court for the District of Massachusetts has not yet established a deadline for the filing of claims against NECC's bankruptcy estate in In re: New England Compounding Pharmacy, Inc.

11

63.     By letter dated October 16, 2012, Saint Thomas Neurosurgical provided NECC with written notice of its intent to assert claims for breach of warranty and other remedies against NECC. In addition, Saint Thomas Neurosurgical and Howell Allen Clinic have actively represented themselves to the Bankruptcy Court for the District of Massachusetts as creditors of NECC who have a stake in NECC's bankruptcy proceeding as a result of Plaintiffs' claims and the claims of those similarly situated. Saint Thomas Neurosurgical and Howell Allen Clinic objected to the Chapter 7 Trustee's motion to establish a deadline for the filing of claims in Case No. 12:19882 HJB; they argued that the proposed deadline could prevent them from filing an accurate and comprehensive account of their contribution and indemnity claims against NECC. On July 24, 2013, during oral arguments on another motion filed in Case no. 12:19882 HJB, Saint Thomas Neurosurgical and Howell Allen Clinic characterized themselves to the Bankruptcy Court as creditors of NECC's bankruptcy estate possessed of indemnity and breach-of-warranty claims. In papers presented in response to that same motion, Saint Thomas Neurosurgical and Howell Allen Clinic insinuated that they intend to seek relief from the automatic stay for the purpose of pursuing indemnity claims against NECC.

64.     Whatever contribution, indemnity, and breach-of-warranty claims Saint Thomas Neurosurgical and Howell Allen Clinic have against NECC are predicated on the contaminated methylprednisolone acetate purchased from NECC.

65.     Upon information and belief, all of the Tennessee Defendants presently intend to seek, and will seek, relief from the stay in order to pursue contribution or indemnity claims against NECC for all or some portion of the damages sought by this Complaint. In addition, or in the alternative, all of the Tennessee Defendants presently intend to file, and will file, claims in

12

NECC's bankruptcy proceeding seeking indemnification or contribution for all or some portion of the damages sought by this Complaint.

66. The Plaintiffs will file a claim against NECC in its bankruptcy proceeding for the injuries at issue in this Complaint.

67. By Order dated May 31, 2013, Judge Saylor ruled that the New England Compounding Pharmacy, Inc., Multi District Litigation Court has subject-matter jurisdiction over any cases pending in federal court or state court against entities or individuals "affiliated" with NECC whether or not NECC is named as a defendant. Those NECC affiliated entities and individuals referred to by Judge Saylor in his May 31, 2013 Order include the Defendants described in paragraphs 24-34.

68. In addition or in the alternative to the bases for jurisdiction already asserted, this Court has subject-matter jurisdiction over all claims against the Tennessee Defendants pursuant to 28 U.S.C. § 1367 in that all such claims are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

69. In addition or in the alternative to the bases for jurisdiction already asserted, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists and the matter in controversy exceeds the sum or value of $75,000. Every issue of law and fact is wholly between citizens of different states.

70. Venue is proper and appropriate in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the events and actions giving rise to the matters asserted in the Complaint occurred in Davidson County, Tennessee.

13

71. At all times relevant the Defendants were engaged in the business of developing, compounding, marketing, distributing, promoting, selecting, purchasing, and/or selling or administering, either directly or indirectly, steroids in the State of Tennessee from which they derived significant and regular income.

72. Defendants are subject to the jurisdiction of this Court in that they are generally present in Tennessee, have transacted business within the State of Tennessee, and acting individually and/or through their agents and employees have committed tortious actions and omissions in Davidson County, Tennessee, that have proximately caused the injuries that are the subject of this lawsuit.

73. The NECC Related Defendants described in paragraphs 24-34 are further subject to the jurisdiction of this Court as a result of contracting to supply goods and things in Tennessee, by conducting or soliciting business in Tennessee, by engaging in a persistent course of conduct in Tennessee, and by deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

STATEMENT OF FACTS

Relevant Background

74. NECC is an entity that has filed for bankruptcy and is protected by the automatic stay provisions of 11 U.S.C. § 362.

75. NECC was a compounding pharmacy that compounded, distributed, and/or sold drugs to purchasers throughout the United States, including Tennessee.

76. Upon information and belief, NECC was a privately held company that was owned and controlled by Barry Cadden, Gregory Conigliaro, Douglas Conigliaro, Carla Conigliaro and Lisa Cadden.

14

77. Ameridose, GDC, MSM, and MSMSW were affiliates of NECC at all relevant times.

78. At least until October 2012, Gregory Conigliaro was involved in co-managing day-to-day operations of NECC, MSM, MSMSW, Ameridose, and GDC.

79. At least until October 2012, Lisa Cadden was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

80. At least until October 2012, Glenn Chinn was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

81. At least until October 2012, Barry Cadden was a licensed pharmacist. In addition to being NECC's President, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Upon information and belief, Barry Cadden compounded medications including MPA at NECC.

82. "Manager of Record or Pharmacist Manager of Record," as defined by 247 CMR 2.00, "means a pharmacist, currently registered by the [Massachusetts] Board [of Registration in Pharmacy] pursuant to 247 CMR 6.07, who is responsible for the operation of a pharmacy or pharmacy department in conformance with all laws and regulations pertinent to the practice of pharmacy and the distribution of drugs."

83. Ameridose, according to an application signed by Gregory Conigliaro and filed with the Massachusetts Board of Registration in Pharmacy on May 14, 2012, is a "distribution center to entities of common ownership – currently Ameridose and NECC, as well as other Properly Licensed Facilities in the future."

84. On information and belief and upon the direction of NECC's principals, on April 11, 2011, Ameridose employee Michelle Rivers requested certification for pharmacy

15

technicians employed by NECC for use in an inspection of NECC's facilities by the Massachusetts Board of Registration in Pharmacy.

85. On or about August 24, 2012, Ameridose posted an employment opportunity for Registered Pharmacists to work for NECC in Framingham, Massachusetts. In the posting, potential applicants were told to contact mlord@medicalesalesmgmt.com. Upon information and belief, there were many other occasions where employees of Ameridose, MSM and/or MSMSW would perform services for NECC at the direction of NECC's principals.

86. Between 2006 and the present, Ameridose and NECC would often share a booth at conferences and conventions with a single banner listing both company names. During that same time, Ameridose and NECC would hold an annual Christmas party for employees of both companies.

87. MSM and/or MSMSW printed materials for and marketed both NECC's and Ameridose's products, including methylprednisolone acetate. One former employee of MSM and/or MSMSW has stated: "I didn't think there was any difference [between Ameridose and NECC]."

88. Through September 2012, both NECC and Ameridose used MSM and/or MSMSW for sales and marketing functions. NECC's privacy policy on its website referred to the "Ameridose Privacy Policy." In 2012, NECC salespersons recommended NECC's "sister company," Ameridose, for drug compounds that NECC did not have available.

89. MSM and/or MSMSW shared office space owned by GDC Properties with NECC in Framingham, Massachusetts.

90. Since it was formed as a limited liability company in 2006, Ameridose has been controlled by NECC.

16

91. Both Ameridose and NECC were controlled by Conigliaro and Cadden family members.

<u>Claims Against the NECC Related Defendants</u>

92. NECC has a well-known history of adverse events relating to its operation as a compounding pharmacy. According to the Majority Memorandum for the November 14, 2012, Oversight and Investigations Subcommittee Hearing, NECC has been the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP") over the past decade often focusing on unsterile conditions at NECC's facilities. For example, the FDA issued a Warning Letter to NECC in 2006. The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions, compounding copies of commercially available drugs, selling misbranded compounded drugs, and problems with storage and sterility. That warning letter has been available to the public on the FDA's website for years.

93. Between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the Clean Room used for the production of methylprednisolone acetate. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC knew or should have known of these findings. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to investigate those isolates and made no effort to identify those isolates. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to perform any product assessments for the products made in the Clean Room where the isolates were found. NECC, Barry Cadden, Gregory Conigliaro, Lisa

17

Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to take any corrective actions with regards to the isolates that were found. Despite these findings, NECC continued to compound methylprednisolone acetate, and Ameridose, MSM, and/or MSMSW continued to distribute marketing materials to customers and potential customers touting the cleanliness of the NECC laboratories.

94.     On September 26, 2012, in the wake of dozens of cases of fungal meningitis associated with NECC's injectable steroid MPA, state agents raided NECC's lab in a strip mall on Waverly Street in Framingham, Massachusetts.

95.     NECC's few remaining employees were scrubbing the compounding areas with bleach. Despite this last-ditch effort, the "clean" rooms were filthy. A leaky boiler stood in a pool of stagnant, dirty water. The autoclaves used to sterilize the product were discolored, tarnished, and contained visible moisture. The air intake came from vents located about 100 feet from a mattress recycling facility that released copious amounts of dust and other contaminants into the air. The air vents in the "clean" rooms were covered with dirt and white fuzz. The metal shelf in the "clean" room used to prepare methylprednisolone acetate was covered in a reddish-brown, cloudy substance.

96.     Investigators determined that NECC's internal records showed dozens of instances of bacterial and fungal contamination within the NECC facility over at least the past nine months. NECC ignored these test results. NECC never even attempted to get rid of these microbial contaminants.

97.     Eighty-three out of three hundred twenty-one observed vials from one of three recalled lots of MPA contained a greenish-black substance visible to the human eye. Seventeen other vials contained a white filamentous material. All fifty out of fifty vials tested confirmed

18

the presence of live microbes (whether fungal or bacterial). The CDC and FDA later confirmed the presence of fungus in unopened vials of NECC's methylprednisolone acetate. This is the same fungus that the CDC confirmed was present in at least forty fungal meningitis cases.

98. Inspections of NECC's sister company Ameridose revealed similarly deplorable conditions, including countless instances of visible contamination of the hoods and rooms used to prepare drug products, insect infestations, birds flying through areas where purportedly sterile products were packaged and stored, and tubs being used to collect rain water that poured through the chronically leaky roof above the "clean" rooms. Ameridose, like NECC, persistently ignored and failed to investigate at least fifty-three instances of known microbiological contamination. Ameridose also hid adverse events associated with its products, failing to report them to the FDA as required by law and instead classifying these events as "patient responses" or "non-complaints" and taking no action to address them.

99. The CDC determined that three lots of 80 mg/ml MPA produced by NECC between May 21 and September 26, 2012, were contaminated with potentially deadly pathogens.

100. In late September 2012, NECC recalled the following lots of methylprednisolone acetate (PF) 80 mg/ml that it had compounded and sold: Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #05212012@68, BUD 11/17/2012; Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #06292012@26, BUD 12/26/2012; and Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #08102012@51, BUD 2/6/2013.

101. NECC identified Saint Thomas Neurosurgical in Nashville, Tennessee, as one of the healthcare providers that received vials of methylprednisolone acetate that were part of the September 2012 recall.

19

102. On or about October 3, 2012, the Massachusetts Department of Public Health ("DPH") secured the surrender of NECC's license to operate as a compounding pharmacy.

103. On October 6, 2012, NECC announced that it was recalling "all products currently in circulation that were compounded at and distributed from its facility in Framingham, Massachusetts."

104. On or about October 8, 2012, at the request of DPH, Barry Cadden and Glenn Chin voluntarily ceased their practice as pharmacists. Lisa Cadden also has voluntarily ceased her practice as a pharmacist. Upon information and belief, none of them have practiced as a pharmacist since voluntarily ceasing their practice.

105. On or about October 22, 2012, the Massachusetts Board of Registration in Pharmacy authorized DPH to request the voluntary permanent surrender of the licenses of Barry Cadden, Glenn Chin, Lisa Cadden, and NECC. According to DPH, "[i]f the three pharmacists and NECC do not comply, the Board authorized staff to proceed with permanent revocation."

106. One of the Massachusetts regulations promulgated by the Massachusetts Board of Registration in Pharmacy pertinent to NECC's operation as a compounding pharmacy mandated that "[t]he premises of the pharmacy or pharmacy department shall at all times be kept in a clean and sanitary manner." 247 CMR 6.02(1).

107. Over the last ten years, ARL has conducted sterility testing on samples of methylprednisolone acetate compounded by NECC, including samples from Lot #05212012@68, BUD 11/17/2012; Lot #06292012@26, BUD 12/26/2012; and Lot #08102012@51, BUD 2/6/2013.

108. From May through August 2012, NECC sent several samples of its MPA to ARL for sterility testing. As one example, on or about May 21, 2012, NECC sent to ARL two 5ml

20

vials of methylprednisolone acetate from a batch of 6,528 vials that came from Lot 05212012@68, which had been compounded by NECC on May 21, 2012.

109. On May 22, 2012, ARL received and tested the two 5ml vials of methylprednisolone acetate that NECC sent to ARL on or about May 21, 2012. ARL sent to NECC a Microbiology Report dated May 25, 2012, which stated that the two vials had been tested on May 22, 2012.

110. ARL's May 25, 2012, Microbiology Report to NECC stated that the "preliminary" results from the sterility test using test method USP 71 showed that the two 5ml vials of methylprednisolone acetate that NECC sent to ARL on or about May 21, 2012, were "sterile." ARL's report to NECC further noted that the preliminary results were observed "after approximately 72 hours of incubation."

111. Pursuant to the protocols of test method USP 71, sterility testing on a batch of more than 6,000 vials of methylprednisolone acetate should have been conducted on at least 20 vials from the batch.

112. On or about August 10, 2012, NECC caused one 5ml vial of methylprednisolone acetate to be sent to ARL for sterility testing from a batch of several thousand vials that are from Lot #08102012@51, BUD 2/6/2013.

113. The Microbiology Reports issued by ARL to NECC between May and September 2012 concerning the sterility testing of methylprednisolone acetate indicated that the sterility tests performed by ARL were conducted in compliance with USP 71.

114. During the summer of 2012, MSM and/or MSMSW sales representatives, on behalf of NECC and Ameridose, distributed copies of the May 25, 2012, ARL Microbiology Report concerning the testing of the vials of methylprednisolone acetate from Lot 05212012@68

21

to customers and/or potential customers in a packet of marketing materials intended to highlight the safety and sterility of the methylprednisolone acetate compounded by NECC.

115. ARL was aware of the risks posed by compounding pharmacies, specifically including the risks posed by NECC's compounding practices.

116. In 2002, ARL found that four samples of a steroid compounded by NECC were contaminated with potentially deadly endotoxins.

117. ARL allowed compounding pharmacies such as NECC to submit an inadequate number of samples for sterility testing, which practice did not comply with USP 71 requirements.

118. GDC which is an acronym for "Gregory D. Conigliaro" owns the real property and is responsible for maintenance and structural improvements at 685–705 Waverly Street, Framingham, Massachusetts.

119. From 1998 until at least October 2012, GDC leased a portion of the premises at Waverly Street to NECC, MSM and MSMSW.

120. In an on-line posting for a property management position at GDC, which appeared on or before October 25, 2012, GDC stated that it "owns an 88,000 square foot facility on seven acres in downtown Framingham. GDC currently has eight major tenants." GDC described one of the duties and responsibilities of the GDC property manager as follows: "Insure all tenants operate their businesses in accordance with facility, local [and] state . . . rules and regulations."

121. GDC maintained a high degree of control over the premises leased by NECC.

122. Until October 2012, NECC, Ameridose, ARL, MSM, MSMSW, Barry Cadden, Lisa Cadden, and Glenn Chin compounded, tested, marketed and/or distributed methylprednisolone acetate.

22

123. GDC and Gregory Conigliaro knew that NECC was compounding preservative-free methylprednisolone acetate at 697 Waverly Street, and further knew that this medication was injected into humans and was required to be sterile.

<u>NECC and the risks of pharmacy compounding</u>

124. The serious risks of pharmacy compounding were also the subject of considerable public discussion in the pharmacy community and the medical community before the subject fungal meningitis outbreak. The risks associated with compounded drugs have been known for years.

125. In 2002, the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections. The report concluded that "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that . . . follows appropriate measures to ensure that injectable products are free of contamination."

126. On March 24, 2005, USA Today published a front page article with the following headline: **"Safety concerns grow over pharmacy-mixed drugs."** That article discussed growing concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA approved and are not subject to the same oversight as drugs produced by pharmaceutical companies.

127. In 2006, the FDA conducted a survey of compounded drug products. They collected thirty-six samples from compounding pharmacies across the United States during unannounced visits. Twelve of the 36 samples (33%) failed analytical testing. The FDA survey concluded "poor quality compounded drugs are a serious public health concern, as improperly compounded products have been linked to grave adverse events, including deaths."

128. In May 2007, the FDA published an article titled "The Special Risks of Pharmacy Compounding." That article highlighted numerous adverse events involving compounded products. It also warned of the emergence of large scale compounding operations that were clearly operating outside of the bounds of traditional compounding practice.

129. In 2010, the FDA posted an educational video on YouTube regarding concerns over the quality of compounded drugs.

130. On November 5, 2010, the American Society of Anesthesiologists, the American Society of Health-System Pharmacists ("ASHP") and other medical societies published a joint report regarding drug shortages. That report included an article written by the ASHP stating as follows:

> Compounding pharmacies have also pursued the production of drugs that are in short supply. Caution is warranted because preparations from these pharmacies may not meet applicable state or federal standards (e.g., United States Pharmacopeia chapter 797 or FDA labeling requirements). The sources of raw materials used by compounding pharmacies have been questioned, and apparent lapses in quality control have resulted in serious patient injury, including death.
>
> . . .
>
> Compounding pharmacies may also present patient risks; several deaths have been associated with improperly sterilized compounded products.

131. In May 2012, the CDC published a report regarding fungal infections arising from medications obtained from a compounding pharmacy. That report advised that "contamination of compounded sterile preparations has caused outbreaks. Since 1990, FDA has learned of approximately 200 adverse events associated with 71 compounded products."

<u>The Fungal Meningitis Outbreak</u>

132. In September 2012, health officials identified an outbreak of fungal meningitis. Investigators traced the outbreak to MPA compounded by NECC.

24

133. On September 18, 2012, a Vanderbilt University Medical Center clinician notified the Tennessee Department of Health of a patient with fungal meningitis who had received a series of epidural steroid injections at Saint Thomas Neurosurgical. On that same date, Dr. Marion Kainer of the Tennessee Department of Health contacted St. Thomas Hospital and spoke with the hospital's Infection Preventionist, Candace Smith.

134. Dr. Kainer told personnel at St. Thomas Hospital that a sentinel event of concern had occurred in a patient who received epidural steroid injections at Saint Thomas Neurosurgical. She requested information from the hospital about the procedure, and she requested that the hospital commence an inspection of the Saint Thomas Neurosurgical clinic. She explained that the event required careful investigation, and she requested that the hospital watch for additional potential cases.

135. Two days later, on September 20, 2012, St. Thomas Hospital reported to the Tennessee Department of Health ("TDH") that two additional patients with meningitis and high levels of white blood cells of unknown cause reported to the hospital. Both of those patients had, likewise, received ESIs at Saint Thomas Neurosurgical. St. Thomas Hospital also reported that methylprednisolone acetate used in the ESIs was obtained from NECC.

136. On September 20, 2012, Saint Thomas Neurosurgical closed voluntarily, sequestered its supplies, and ordered new supplies from other distributors.

137. According to the CDC, fungal meningitis occurs when the protective membranes covering the brain and spinal cord are infected with a fungus. Fungal meningitis is rare and usually caused by the spread of a fungus through blood to the spinal cord. Fungal meningitis is not transmitted from person to person.

25

138. According to the CDC, symptoms of meningitis include the following: new or worsening headache; fever; sensitivity to light; stiff neck; new weakness or numbness in any part of the body; slurred speech; and increased pain, redness, or swelling at the injection site. Death may result from meningitis.

139. According to the CDC, symptoms of fungal meningitis are similar to symptoms of other forms of meningitis; however, they often appear more gradually and can be very mild at first. In addition to typical meningitis symptoms, like headache, fever, nausea, and stiffness of the neck, people with fungal meningitis may also experience confusion, dizziness, and discomfort from bright lights. Patients might just have one or two of these symptoms.

140. According to the CDC, localized spinal or paraspinal infections at or near the injection site may occur on their own or in patients diagnosed with fungal meningitis.

141. According to the CDC, diagnostic tests recommended for the diagnosis of fungal infections associated with the contaminated ESIs include, but are not limited to, MRIs and fungal cultures using cerebrospinal fluid. Cerebrospinal fluid is collected by performing a lumbar puncture, or spinal tap.

### Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg's Decision to Purchase MPA from NECC

142. Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg are sometimes collectively referred to as the "Saint Thomas Neurosurgical defendants."

143. During all relevant times, Dr. Culclasure and Ms. Schamberg co-managed Saint Thomas Neurosurgical's day-to-day operations.

144. During all relevant times, Dr. Culclasure and Ms. Schamberg were directly involved and responsible for Saint Thomas Neurosurgical's decision to purchase MPA from NECC.

26

145. Saint Thomas Neurosurgical, its agents and employees, Dr. Culclasure and Ms. Schamberg, knew or should have known of the dangers of using compounded drugs and specifically products compounded by NECC. These Defendants failed to undertake any appropriate due diligence to ascertain the safety and quality of NECC's products.

146. The only motivation for Saint Thomas Neurosurgical, Dr. Culclasure, and Ms. Schamberg to purchase steroids in bulk from NECC was price.

147. Saint Thomas Neurosurgical, Dr. Culclasure, and Ms. Schamberg made the decision to purchase MPA in bulk from NECC because it was the cheapest steroid.

148. The Saint Thomas Neurosurgical defendants did not conduct appropriate due diligence or investigation into NECC before deciding to purchase and administer NECC compounded steroids to their patients. The Saint Thomas Neurosurgical defendants placed their own profits over patient safety.

149. NECC was not authorized to compound and sell MPA in bulk to Saint Thomas Neurosurgical.

150. NECC was only allowed to fill individual prescriptions for individual patients written by appropriately licensed healthcare providers.

151. Saint Thomas Neurosurgical did not use patient-specific individual prescriptions when buying MPA from NECC in bulk.

152. Saint Thomas Neurosurgical could have purchased MPA for use in epidural steroid injections ("ESI") from a compounder other than NECC.

153. Saint Thomas Neurosurgical could have purchased MPA for use in ESI's from a pharmaceutical manufacturer, e.g., Pfizer.

27

154. From 2000 to the present, the medication formulary for Saint Thomas Neurosurgical lists those steroids acceptable for use at Saint Thomas Neurosurgical and includes: Decadron, Depo-medrol, Solumedrol and Celestone Soluspan.

155. The Saint Thomas Neurosurgical formulary does not include generic methylprednisolone acetate ("MPA") or MPA from a compounding company as acceptable for use at Saint Thomas Neurosurgical.

156. The Saint Thomas Neurosurgical formulary does include and allow for the administration of methylprednisolone acetate manufactured by Pfizer under the name Depo-medrol.

157. In late 2010, Saint Thomas Neurosurgical began purchasing MPA from Clint Pharmaceuticals.

158. The MPA that Saint Thomas Neurosurgical purchased from Clint Pharmaceuticals came from an FDA approved manufacturer.

159. Clint Pharmaceuticals represents that it has historically recommended that practitioners not use compounded steroids especially when FDA approved products are available. Saint Thomas Neurosurgical purchased MPA from Clint Pharmaceuticals at the price of $6.49 per 80mg vial.

160. In May 2011, an NECC sales representative emailed Saint Thomas Neurosurgical's facility director, Ms. Schamberg, asking what price NECC would need to offer for MPA in order to gain Saint Thomas Neurosurgical's business. Ms. Schamberg replied that if NECC could get the price under $6.50 per vial she would be willing to "talk" to NECC.

161. On June 9, 2011, Clint Pharmaceuticals increased the price to Saint Thomas Neurosurgical for MPA from $6.49 to $8.95 per vial, an increase of $2.46 per vial. A true and

28

correct copy of an Invoice from Clint Pharmaceuticals dated June 9, 2011, showing that price increase is attached hereto as Exhibit 2.

162. Saint Thomas Neurosurgical was not willing to pay $8.95 per vial of MPA from Clint Pharmaceuticals if it could be procured more cheaply from NECC.

163. On June 10, 2011, Ms. Schamberg on behalf of Saint Thomas Neurosurgical, emailed an NECC sales representative indicating that if NECC would guarantee a price for MPA of $6.50 per 80mg vial, Saint Thomas Neurosurgical would be willing to do business with NECC. (June 10, 2011, email from Ms. Schamberg attached as Exhibit 3 and incorporated herein by reference).

164. After NECC indicated its willingness to sell Saint Thomas Neurosurgical MPA for $6.50 per 1mL 80mg vial, Ms. Schamberg obtained approval from Dr. Culclasure to begin ordering from NECC.

165. Both Ms. Schamberg and Dr. Culclasure approved the purchases of MPA from NECC.

166. Saint Thomas Neurosurgical placed its first order with NECC on or about June 10, 2011. That order consisted of 500 1mL 80 mg vials of MPA and 200 2mL 80 mg vials of MPA.

167. A copy of the Prescription Order Form referenced in the preceding paragraph reflecting Saint Thomas Neurosurgical's first order with NECC is attached as Exhibit 4 and incorporated herein by reference.

168. The June 2011 order form attached as Exhibit 4 did not contain any patient names despite the fact that the order form included a column for that information.

169. As evidenced by Dr. John Culclasure's name/signature on the June 2011 order form attached as Exhibit 4, Dr. Culclasure was aware of and approved the purchase of MPA from NECC.

170. NECC sent invoices to Saint Thomas Neurosurgical evidencing five separate purchases by Saint Thomas Neurosurgical of five hundred 80 mg. vials of MPA as reflected in invoices dated June 6, 2012; June 26, 2012; July 25, 2012; August 13, 2012; and August 31, 2012. (Invoices attached as Exhibit 5 and incorporated herein by reference. )

171. NECC charged Saint Thomas Neurosurgical $6.50 for each 80 mg. vial of MPA. (Exhibit 5).

172. In early to mid-2012, an NECC representative informed Ms. Schamberg that NECC needed Saint Thomas Neurosurgical to submit a list of patients with each order in order to comply with Massachusetts Board of Pharmacy rules.

173. Ms. Schamberg told the NECC representative that she could not predict which patients would receive MPA. The NECC representative indicated that any list of patient names would suffice.

174. Saint Thomas Neurosurgical provided NECC with a list of previous patients' names (including Mickey Mouse) with their order(s) for MPA from NECC. Saint Thomas Neurosurgical provided those patient lists to NECC even though the patients on those lists did not necessarily receive MPA.

175. Plaintiffs attach as Exhibit 6, and incorporate herein by reference, a list of patient names (redacted) submitted to NECC by Saint Thomas Neurosurgical showing the name "Mickey Mouse."

30

176. Defendants Dr. Culclasure. Ms. Schamberg, and Saint Thomas Neurosurgical knew or should have known that sending a list of previous patient names to NECC including "Mickey Mouse" was inappropriate and unlawful. Such conduct evidenced an effort by Dr. Culclasure, Ms. Schamberg, and Saint Thomas Neurosurgical to collude with NECC and was an effort to subvert the individual prescription rule of the Massachusetts Board of Pharmacy.

177. By sending the list of previous patient names to NECC, Defendants Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg unlawfully conspired and acted in concert with NECC to violate a patient safety rule thereby resulting in harm to the Plaintiffs' and other patients who received NECC's MPA.

178. Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg knew of NECC's intent to use patient lists to circumvent Massachusetts Board of Pharmacy requirements.

### Plaintiffs are injected with MPA from NECC and develop various medical conditions including Fungal Meningitis and other illnesses causing Plaintiffs to undergo various treatments

179. Between June 2012 and September 2012, Plaintiffs received one or more ESIs from the contaminated lots at Saint Thomas Neurosurgical. Plaintiffs were referred from Howell Allen Clinic to Saint Thomas Neurosurgical for the ESIs. A chart outlining each Plaintiff's injection date and to the best belief and knowledge of the Plaintiffs the lot number of the contaminated MPA, the manufacture date, and the dosage amount is attached as Exhibit 1.

180. One or more of each Plaintiff's ESIs came from contaminated lots of MPA purchased from NECC. The contaminated lots were subsequently recalled by NECC.

181. As a direct and proximate result of receiving the contaminated ESIs during the time period between June 2012 and September 2012, Plaintiffs developed medical conditions including, but not limited to, fungal meningitis, symptoms associated with fungal meningitis, localized spinal or paraspinal infections (i.e. epidural abscesses, arachnoiditis, phlegmon, etc.),

31

anxiety, depression, and complications associated with lumbar punctures. Plaintiffs continue to suffer from the effects of these medical conditions.

182. As a direct and proximate result of receiving the contaminated ESIs during the time period between June 2012 and September 2012, Plaintiffs underwent various painful and expensive medical treatments including, but not limited to, lumbar punctures, blood patches, hospitalizations, MRIs, and CT scans.

183. Several Plaintiffs had additional ESIs or appointments at Howell Allen Clinic or Saint Thomas Neurosurgical scheduled on or shortly after September 20, 2012. When Saint Thomas Neurosurgical or Howell Allen Clinic staff called Plaintiffs to cancel or reschedule these appointments, it cited "equipment issues" and made no mention of the contaminated MPA.

184. During the early part of October 2012, the plaintiffs first learned of an investigation regarding injections provided at Saint Thomas Neurosurgical Center either by letter, phone call or both from the Tennessee Health Department, CDC, Saint Thomas Neurosurgical Center, and other Defendants. Before this time, the plaintiffs had no reason to believe that they had been injected with tainted ESIs.

CAUSES OF ACTION

COUNT I
CIVIL CONSPIRACY

185. All allegations above are incorporated herein by reference.

186. Defendants Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg acted in concert with NECC to accomplish the unlawful purpose of circumventing Massachusetts Board of Pharmacy patient safety requirements. Those Defendants accomplished that unlawful purpose via the unlawful means of using bogus patient lists to accompany orders of MPA. Those

32

patient lists did not correspond with persons who actually received MPA, and the lists contained fictitious names such as "Mickey Mouse."

187. Defendants Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg were aware of NECC's intent to use such patient lists in order to subvert Massachusetts Board of Pharmacy requirements.

188. The concerted action of NECC, Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg resulted in harm to Plaintiffs and other patients who received NECC's MPA.

189. Defendants Saint Thomas Neurosurgical, Dr. Culclasure and Ms. Schamberg are liable for the acts of their co-conspirator NECC.

## COUNT II
### DUTY TO PREVENT FORESEEABLE HARM BY NECC
(Against Tennessee Defendants)

190. All allegations above are incorporated herein by reference.

191. Plaintiffs played no role in selecting the supplier of the MPA that the Defendant Saint Thomas Neurosurgical, through its agents and employees, injected into their spines. Plaintiffs relied exclusively upon Saint Thomas Neurosurgical, and its employees and agents, to make that selection.

192. Given the well-known dangers of bulk pharmacy compounding, the Tennessee Defendants ignored grave risks of foreseeable harm when they permitted Saint Thomas Neurosurgical to purchase injectable steroids from NECC in bulk and without individual prescriptions.

193. Given the well-known dangers of bulk pharmacy compounding, the Tennessee Defendants ignored grave risks of foreseeable harm when they permitted Saint Thomas

33

Neurosurgical to conspire with NECC in the creation of false paper trails intended to hide NECC's wrongful and intentional conduct from regulators.

194. The Tennessee Defendants stood in a special relationship with Plaintiffs. By virtue of that special relationship, the Tennessee Defendants owed a duty to protect their patients, including Plaintiffs, from foreseeable harm caused by NECC's intentional conduct.

195. NECC engaged in numerous instances of intentional misconduct. That intentional misconduct included but is not limited to: (a) mass producing compounded medications and selling them in bulk in circumvention of the FDA system of regulating drug manufactures; (b) providing false information to government regulators; (c) mass producing compounded medications and shipping those medications to Tennessee without patient specific prescriptions in violation of Massachusetts Board of Pharmacy Rules and Tenn. Code Ann. § 63-10-204(4); (d) enlisting the aid of its customers (including Saint Thomas Neurosurgical) in creating false paper trails designed to hide its misconduct from government regulators; and (e) mass producing purportedly sterile injectable drugs under filthy conditions in violation of regulations promulgated by the Massachusetts Board of Registration in Pharmacy and found at 247 CMR 6.02(1).

196. The Tennessee Defendants breached their duty to their patients, including Plaintiffs, by failing to protect them from the foreseeable harm caused by NECC's intentional conduct.

197. As a direct and proximate result of the Tennessee Defendants' breach of their duties, Plaintiffs sustained various injuries and medical conditions including, but not limited to, fungal meningitis, localized spinal or paraspinal infections (i.e. epidural abscesses, arachnoiditis, phlegmon, etc.), anxiety, depression, and complications associated with lumbar punctures. The

34

Plaintiffs' injections of MPA also caused them to undergo various medical treatments including, but not limited to, lumbar punctures, blood patches, hospitalizations, MRIs, and CT scans.

198. Because the Tennessee Defendants owed Plaintiffs a duty to protect them from NECC's conduct, the Tennessee Defendants' fault cannot be reduced by any fault attributable to NECC. Accordingly, the Tennessee Defendants are jointly and severally liable for all harm caused by NECC's conduct.

COUNT III

NEGLIGENCE
(Against NECC Related Defendants)

199. All allegations above are incorporated herein by reference.

200. As the designer, tester, compounder, seller, marketer and/or distributor of consumer products, the NECC Related Defendants owed a duty to the Plaintiffs to comply with existing standards of care, and to exercise due care, in providing a safe and quality product to the Plaintiffs.

201. Specifically, but without limitation:

    a. Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin owed Plaintiffs a duty to provide methylprednisolone acetate that was safe and free of contamination.

    b. ARL owed Plaintiffs a duty to properly conduct tests to insure that the methylprednisolone acetate was safe and free of contamination.

202. Defendants breached those duties, and were otherwise negligent in their design, compounding, sale, testing, marketing, and distribution of the recalled steroid medication, which was administered to the Plaintiffs. The Defendants failed to exercise due care in accordance with the standard of care and skill required of, and ordinarily exercised by, a designer, compounder, tester, seller, marketer, and distributor of steroid medications, as licensed to do so by the

35

Commonwealth of Massachusetts. The Defendants, by and through their supervisors, staff and agents engaged in designing, compounding, storing, testing, selling, marketing and distributing MPA in a negligent manner.

203. Defendants further breached those duties by failing to properly design, compound, test and distribute MPA so that it would not be contaminated with fungus; by failing to properly maintain its facilities where it compounded its medications in a clean, sanitary manner; by failing to oversee the security and quality control of its compounding and distribution facilities; and by allowing contaminated and unsafe compounded medications to reach the stream of commerce for use by Plaintiff.

204. Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Plaintiffs by failing to use reasonable care in designing, compounding, testing, marketing, distributing and/or selling methylprednisolone acetate.

205. The negligence of Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin was a proximate cause of Plaintiffs' injuries.

206. Plaintiffs were exposed to fungal meningitis through NECC's contaminated steroids that were injected into them during the time period of June 2012 through September 2012.

## COUNT IV

### NEGLIGENCE PER SE
(Against all NECC Related Defendants except ARL)

207. All allegations above are incorporated herein by reference.

208. Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin owed Plaintiffs a duty to maintain the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

209. Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Plaintiffs by failing to use reasonable care in maintaining the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

210. Defendants also violated Massachusetts' laws and its pharmacy licensing obligations.

211. The aforementioned actions by Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin were a proximate cause of Plaintiffs' injuries.

COUNT V

NEGLIGENT SUPERVISION
(Against NECC Related Defendants)

212. All allegations above are incorporated herein by reference.

213. Defendants Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin had an obligation and duty to exercise due care, and comply with the then existing standard of care, to investigate and hire professional and competent employees to create, test, package, market, and distribute the compounded medications and to maintain the facility and its premises, and to make sure the compounded drugs did not create any harm or risk to the Plaintiffs and others who received the compounded medication.

37

214. In breach of those duties, Defendants failed to exercise due care and failed to supervise their employee(s) or agent(s), who were at all times working within the scope of their employment and authority. Specifically, and without limitation:

    a. The Defendants failed to monitor and test the steroid medication and were otherwise negligent in supervision of their employees.

    b. Defendants also failed to monitor and supervise the testing of the compounded medications.

    c. The Defendants were negligent in hiring, training, and supervising their employees.

215. The Defendants knew, or should have known, that their employee(s) or agent(s) did not follow proper procedures and knew or should have known of the risks created by failing to do so.

216. As a direct and proximate cause of the breach of those duties, the Defendants permitted the steroid to become contaminated and distributed to patients, including the Plaintiffs.

217. The aforementioned actions by Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin were a proximate cause of Plaintiffs' injuries.

## COUNT VI

### PUBLIC NUISANCE
(Against Barry Cadden, Gregory Conigliaro and GDC)

218. All allegations above are incorporated herein by reference.

219. At all relevant times, Barry Cadden, Gregory Conigliaro, and/or GDC were in control of the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

220. Barry Cadden, Gregory Conigliaro, and GDC owed a duty to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts, in a condition that was free from contamination.

38

221. Barry Cadden, Gregory Conigliaro, and GDC failed to exercise reasonable care in maintaining the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

222. The failure by Barry Cadden, Gregory Conigliaro, and GDC to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts, was a proximate cause of the multistate epidemic of fungal meningitis and infections caused by the contaminated methylprednisolone acetate.

223. Barry Cadden, Gregory Conigliaro, and GDC unreasonably and significantly interfered with the public health and the public safety.

224. Barry Cadden, Gregory Conigliaro, and GDC unreasonably and significantly interfered with the public right expressed in 247 CMR 6.02(1).

225. The public nuisance created by Barry Cadden, Gregory Conigliaro, and GDC was a proximate cause of Plaintiffs' injuries.

226. The public nuisance created by Barry Cadden, Gregory Conigliaro, and GDC has caused the Plaintiffs' special injuries in that the Plaintiffs' have sustained injuries to their personal health.

## COUNT VII

### PRODUCT LIABILITY CLAIMS
(Against Saint Thomas Neurosurgical and Howell Allen Clinic)

227. All allegations above are incorporated herein by reference.

228. The MPA injected into the Plaintiffs during the time period of June 2012 through September 2012 was compounded by NECC.

229. On December 21, 2012, NECC filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the

39

District of Massachusetts, In re: New England Compounding Pharmacy, Inc., case no. 12-19882-HJB.

230. Pursuant to 11 U.S.C. § 362(a)(1) certain actions against NECC are stayed following its bankruptcy petition.

231. Plaintiffs could have commenced an action in this court seeking to recover on a claim and seeking a judgment against NECC before December 21, 2012.

232. Plaintiffs' claims that arose before NECC's petition in bankruptcy are subject to the automatic stay provisions of 11 U.S.C. § 362(a)(1).

233. NECC has ceased operations.

234. NECC is unable to pay its debts as they fall due.

235. NECC is unable to pay its debts in the ordinary course of its business.

236. NECC's liabilities exceed its assets.

237. NECC is insolvent.

238. On July 24, 2013, The United States Bankruptcy Court for the District of Massachusetts in In re: New England Compounding Pharmacy, Inc., Case no. 12-19882-HJB, ordered that with respect to certain claims, including those asserted by Plaintiffs in this lawsuit, NECC is presently insolvent and has been insolvent at all times since the petition date.

239. Saint Thomas Neurosurgical procured the MPA injected into Plaintiffs' lumbar spine from NECC.

240. NECC's product (MPA) was defective and unreasonably dangerous when it left NECC's control because it was contaminated with lethal pathogens.

241. NECC's MPA was in substantially the same condition at the time that Saint Thomas Neurosurgical and Howell Allen Clinic injected it into the Plaintiffs' spines during the time period of June 2012 through September 2012.

242. Saint Thomas Neurosurgical and Howell Allen Clinic charged the Plaintiffs' for epidural steroid injections administered to them.

243. Saint Thomas Neurosurgical and Howell Allen Clinic acted as a seller or distributor of MPA compounded by NECC when it sold and administered epidural steroid injections to patients, including the Plaintiffs.

244. Saint Thomas Neurosurgical and Howell Allen Clinic were engaged in the business of selling MPA compounded by NECC.

245. Accordingly, Saint Thomas Neurosurgical and Howell Allen Clinic are "sellers" as defined by Tenn. Code Ann. § 29-28-102(7).

246. Tenn. Code Ann. § 29-28-106(4) authorizes the Plaintiffs to prosecute product liability claims against Saint Thomas Neurosurgical and Howell Allen Clinic as the seller of the MPA injected into the Plaintiffs because the compounder of the product, NECC, cannot be served with process in this state.

247. Tenn. Code Ann. § 29-28-106(5) authorizes the Plaintiffs to prosecute product liability claims against Saint Thomas Neurosurgical and Howell Allen Clinic as the seller of the MPA injected into the Plaintiffs' spine because the compounder of the product, NECC, has been judicially declared insolvent.

248. The MPA that Saint Thomas Neurosurgical and Howell Allen Clinic injected into the Plaintiffs was unreasonably dangerous and defective at the time it left their control because it was contaminated with lethal pathogens.

41

249. Specifically, the MPA was in a defective condition and unreasonably dangerous at all relevant times because it was unsafe for normal or anticipated handling as defined by Tenn. Code Ann. § 29-28-102(2).

250. The MPA sold and distributed by Saint Thomas Neurosurgical and Howell Allen Clinic was neither merchantable nor fit for the purpose for which it was produced and sold. Accordingly, Saint Thomas Neurosurgical and Howell Allen Clinic breached their warranties, both express and implied, as stated in Tenn. Code Ann. §§ 47-2-313, 47-2-314, and 47-2-315, including their warranty of fitness for a particular purpose.

251. Saint Thomas Neurosurgical and Howell Allen Clinic are strictly liable for the injuries and losses caused by the unreasonably dangerous and defective steroids injected into the Plaintiffs.

## COUNT VIII

### CLAIMS AGAINST SAINT THOMAS NEUROSURGICAL

252. All allegations above are incorporated herein by reference.

253. Saint Thomas Neurosurgical's decision to select NECC as its supplier of purportedly sterile injectable steroids was negligent.

254. Saint Thomas Neurosurgical knew or should have known that NECC was not a safe and reputable supplier of injectable steroids such as MPA.

255. Saint Thomas Neurosurgical, acting through its agents, employees, and representatives, negligently and recklessly purchased contaminated MPA from NECC.

256. Saint Thomas Neurosurgical failed to conduct appropriate due diligence regarding NECC. Had they done so, any reasonable purchaser would have declined to purchase from NECC.

42

257. Saint Thomas Neurosurgical, acting through its physicians, nurses, managers, agents, and employees, was negligent in its care and treatment of the Plaintiffs. Such care and treatment fell below the recognized standard of acceptable professional practice for pain management and drug procurement practices in this or similar communities and was a proximate cause of the Plaintiffs' injuries and damages. Specifically, Saint Thomas Neurosurgical was negligent and rendered substandard care in the following respects:

a. procured injectable steroids from NECC, for the purpose of injecting those medications into the spines of patients for profit, without conducting adequate due diligence regarding whether NECC was a reputable and safe supplier of sterile injectable compounds;

b. failed to visit NECC's facilities before procuring spinal injection medicines from that company;

c. failed to investigate and exercise sufficient due diligence before administering injectable steroids procured from NECC, including its failure to investigate or inquire concerning NECC's compounding practices;

d. failed to determine whether NECC had a history of recalling compounded medications before procuring spinal injection medicines from that company;

e. failed to investigate NECC's regulatory history with the FDA and/or the Massachusetts Board of Registration in Pharmacy before procuring spinal injection medicines from that company;

f. failed to determine whether NECC had a history of product liability suits before procuring spinal injection medicines from that company;

g. failed to keep abreast of the dangers of sterile compounding;

h. purchased compounded injectable steroids in bulk from NECC without using patient specific individual prescriptions;

i. failed to adequately supervise and train the physicians, nurses, agents and employees who ordered MPA from NECC;

j. failed to follow its own formulary that would have prevented the use of MPA compounded by NECC in epidural steroid injections;

43

k. failed to implement policies and procedures that would prevent the procurement of purportedly sterile injectable medications from an out-of-state compounding pharmacy with deplorable sterility procedures, a checkered regulatory past, product recall problems, and a history of product liability suits;

l. injected steroids into the Plaintiffs without taking reasonable steps to ensure that those medicines were from a reputable supplier and were not contaminated with lethal pathogens;

m. approved, facilitated or permitted the purchase of MPA from NECC because it was less expensive than safer alternatives; and

n. failed to promptly notify the Plaintiffs that they were injected with potentially contaminated steroids and failed to recommend that they receive prompt treatment of their potential fungal infections.

258. As a direct and proximate result of the negligent acts and omissions described above, the Plaintiffs suffered injuries and damages that would not have otherwise occurred.

259. The physicians, nurses, agents, employees and representatives who decided to procure MPA from NECC and who injected that steroid into the Plaintiffs were employees or agents of Saint Thomas Neurosurgical, and they were acting within the course and scope of their employment or agency. Accordingly, Saint Thomas Neurosurgical is liable for the consequences of said person or persons' conduct pursuant to the doctrine of *respondeat superior*.

## COUNT IX

### CLAIMS AGAINST JOHN CULCLASURE, M.D., AND DEBRA SCHAMBERG, R.N.

260. All allegations above are incorporated herein by reference.

261. Dr. Culclasure, as Medical Director of Saint Thomas Neurosurgical, and Ms. Schamberg, as Facilities Director of Saint Thomas Neurosurgical, made the decision to purchase MPA from NECC.

262. Dr. Culclasure and Ms. Schamberg were involved in co-managing the day-to-day operations at Saint Thomas Neurosurgical.

44

263. Dr. Culclasure and Ms. Schamberg were negligent in their selection of NECC as a supplier of MPA to Saint Thomas Neurosurgical.

264. Dr. Culclasure and Ms. Schamberg knew or should have known that NECC was not a safe and reputable supplier of injectable steroids such as MPA.

265. Dr. Culclasure and Ms. Schamberg failed to conduct appropriate due diligence regarding NECC. Had they done so, any reasonable purchaser would have declined to purchase from NECC.

266. Dr. Culclasure and Ms. Schamberg's decision to purchase MPA in bulk from NECC was based solely on price.

267. In making the decision to purchase compounded MPA from NECC, Dr. Culclasure and Ms. Schamberg failed to follow the medication formulary adopted by Saint Thomas Neurosurgical.

268. Defendants, John Culclasure, M.D., and Debra Schamberg, R.N., were negligent in their care and treatment of the Plaintiffs. Such care and treatment fell below the recognized standard of acceptable professional practice for physicians and registered nurses in similar circumstances in this or similar communities and was a proximate cause of the Plaintiffs' injuries and damages. Specifically, Dr. Culclasure and Ms. Schamberg were negligent and rendered substandard care in the following respects:

 a. procured injectable steroids from NECC, for the purpose of injecting those medications into the spines of patients for profit, without conducting adequate due diligence regarding whether NECC was a reputable and safe supplier of sterile injectable compounds;

 b. failed to visit NECC's facilities before procuring spinal injection medicines from that company;

 c. failed to investigate and exercise sufficient due diligence before administering injectable steroids procured from NECC, including

45

its failure to investigate or inquire concerning NECC's compounding practices;

d. failed to determine whether NECC had a history of recalling compounded medications before procuring spinal injection medicines from that company;

e. failed to investigate NECC's regulatory history with the FDA and/or the Massachusetts Board of Registration in Pharmacy before procuring spinal injection medicines from that company;

f. failed to determine whether NECC had a history of product liability suits before procuring spinal injection medicines from that company;

g. failed to keep abreast of the dangers of sterile compounding;

h. failed to follow Saint Thomas Neurosurgical's own formulary that would have prevented the use of MPA compounded by NECC in epidural steroid injections;

i. injected steroids into the Plaintiffs without taking reasonable steps to ensure that those medicines were from a reputable supplier and were not contaminated with lethal pathogens;

j. approved, facilitated or permitted the purchase of MPA from NECC because it was less expensive than safer alternatives;

k. purchased compounded injectable steroids in bulk from NECC without using patient specific individual prescriptions; and

l. submitted lists of previous patients' names (including Mickey Mouse) to NECC when ordering MPA even though such lists did not correspond with patients who actually received MPA.

269. As a direct and proximate result of the negligent acts and omissions described above, the Plaintiffs suffered injuries and damages that would not have otherwise occurred.

COUNT X

CLAIMS AGAINST HOWELL ALLEN CLINIC

270. All allegations above are incorporated herein by reference.

46

271. Howell Allen Clinic, acting through its physicians, nurses, agents, employees, and representatives, including Dr. Culclasure and Ms. Schamberg, operated Saint Thomas Neurosurgical.

272. Howell Allen Clinic, acting through its physicians, nurses, agents, employees, and representatives, was negligent in the manner in which it operated Saint Thomas Neurosurgical.

273. Howell Allen Clinic knew or should have known that NECC was not a safe and reputable supplier of injectable steroids such as MPA.

274. Howell Allen Clinic, acting through its physicians, nurses, agents, employees, and representatives, was negligent in its care and treatment of the Plaintiffs. Such care and treatment fell below the recognized standard of acceptable professional practice for pain management and drug procurement practices in this or similar communities and was a proximate cause of the Plaintiffs' injuries and damages.

275. Howell Allen Clinic was negligent in the following respects:

   a. operated Saint Thomas Neurosurgical in a manner which facilitated the procurement of injectable steroids from NECC, for the purpose of injecting those medications into the spines of patients for profit, without conducting adequate due diligence regarding whether NECC was a reputable and safe supplier of sterile injectable compounds;

   b. failed to visit NECC's facilities before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

   c. failed to determine whether NECC had a history of recalling compounded medications before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from that company;

   d. failed to investigate NECC's regulatory history with the FDA and/or the Massachusetts Board of Registration in Pharmacy before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

47

e. failed to determine whether NECC had a history of product liability suits before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

f. failed to keep abreast of the dangers of sterile compounding while operating Saint Thomas Neurosurgical;

g. failed to operate Saint Thomas Neurosurgical with reasonable and due care, including a complete failure to supervise its drug procurement practices reasonably;

h. failed to supervise Saint Thomas Neurosurgical adequately;

i. allowed Saint Thomas Neurosurgical to procure compounded injectable steroids in bulk from NECC without using patient specific individual prescriptions;

j. failed to adequately supervise and train the physicians, nurses, agents and employees who ordered MPA from NECC;

k. failed to implement or enforce policies and procedures that would prevent the procurement of purportedly sterile injectable medications from an out-of-state compounding pharmacy with deplorable sterility procedures, a checkered regulatory past, product recall problems, and a history of product liability suits;

l. facilitated or permitted the injection of steroids into the Plaintiffs without taking reasonable steps to ensure that those medicines were from a reputable supplier and were not contaminated with lethal pathogens;

m. approved, facilitated or permitted the purchase of MPA from NECC because it was less expensive than safer alternatives; and

n. failed to promptly notify the Plaintiffs that they were injected with potentially contaminated steroids and failed to recommend that they receive prompt treatment of their potential fungal infections.

276. As a direct and proximate result of the negligent acts and omissions described above, Plaintiffs suffered injuries and damages that would not have otherwise occurred.

277. The physicians, nurses, agents, employees, and representatives who decided to procure MPA from NECC and who injected that steroid into the Plaintiffs were employees or agents of Howell Allen Clinic, and they were acting within the course and scope of their

48

employment or agency. Accordingly, Howell Allen Clinic is liable for the consequences of said person or persons' conduct pursuant to the doctrine of *respondeat superior*.

278. Howell Allen Clinic represented to patients that Saint Thomas Neurosurgical is part of Howell Allen Clinic. Saint Thomas Neurosurgical, its physicians, nurses and employees, were the actual or apparent agents of Howell Allen Clinic. Howell Allen Clinic is liable for the conduct of Saint Thomas Neurosurgical, its physicians, nurses, employees and representatives, under the doctrine of *respondeat superior* and basic principles of agency--both express and apparent agency. In addition, Saint Thomas Neurosurgical is the alter ego of Howell Allen Clinic.

279. Howell Allen Clinic operated Saint Thomas Neurosurgical and failed to maintain an arms-length relationship with that entity. Through its operation of Saint Thomas Neurosurgical, Howell Allen Clinic dominated and controlled Saint Thomas Neurosurgical, while employing its Medical Director and its Facility Director, such that Saint Thomas Neurosurgical functioned as an instrumentality of Howell Allen Clinic.

COUNT XI

CLAIMS AGAINST ST. THOMAS HOSPITAL

280. All allegations above are incorporated herein by reference.

281. Saint Thomas Neurosurgical, its physicians, nurses and employees were the actual or apparent agents of St. Thomas Hospital. St. Thomas Hospital is liable for the conduct of Saint Thomas Neurosurgical, its physicians, nurses, employees and representatives, under the doctrine of *respondeat superior* and basic principles of agency.

282. Saint Thomas Neurosurgical is the actual, ostensible, and apparent agent of St. Thomas Hospital. Saint Thomas Neurosurgical is the agent of St. Thomas Hospital because Saint Thomas Neurosurgical shares a common name with St. Thomas Hospital. In addition,

49

Saint Thomas Neurosurgical's clinic is located in the Saint Thomas Medical Plaza office building located on the St. Thomas Hospital campus. St. Thomas Hospital did not give notice to patients of Saint Thomas Neurosurgical that it was not the provider of care or that the care provided by Saint Thomas Neurosurgical was not subject to the control and supervision of St. Thomas Hospital. In addition, once the fungal meningitis outbreak occurred, Saint Thomas Neurosurgical instructed many patients to report to the St. Thomas Hospital emergency room for evaluation and treatment.

## COUNT XII

## CLAIMS AGAINST SAINT THOMAS[1]

283. All allegations above are incorporated herein by reference.

284. Saint Thomas and Howell Allen Clinic acted in concert to operate jointly the Defendant Saint Thomas Neurosurgical.

285. Saint Thomas and Howell Allen Clinic were negligent in the manner in which they operated Saint Thomas Neurosurgical.

286. Saint Thomas and Howell Allen Clinic knew or should have known that NECC was not a safe and reputable supplier of injectable steroids such as MPA.

287. Saint Thomas was negligent in the following respects:

    a.    operated Saint Thomas Neurosurgical in a manner which facilitated the procurement of injectable steroids from NECC, for the purpose of injecting those medications into the spines of patients for profit, without conducting adequate due diligence regarding whether NECC was a reputable and safe supplier of sterile injectable compounds;

    b.    failed to visit NECC's facilities before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

---

[1] As noted in paragraph 52 above, Defendants Saint Thomas Network and Saint Thomas Health are collectively referred to as "Saint Thomas."

c. failed to determine whether NECC had a history of recalling compounded medications before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from that company;

d. failed to investigate NECC's regulatory history with the FDA and/or the Massachusetts Board of Registration in Pharmacy before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

e. failed to determine whether NECC had a history of product liability suits before permitting its agent, Saint Thomas Neurosurgical, to procure spinal injection medicines from NECC;

f. failed to keep abreast of the dangers of sterile compounding while operating Saint Thomas Neurosurgical;

g. failed to operate Saint Thomas Neurosurgical with reasonable and due care, including a complete failure to supervise its drug procurement practices reasonably;

h. failed to supervise Saint Thomas Neurosurgical adequately;

i. failed to exercise due and reasonable care in conducting Saint Thomas Neurosurgical's financial and contracting operations;

j. allowed Saint Thomas Neurosurgical to procure compounded injectable steroids in bulk from NECC without using patient specific individual prescriptions;

k. failed to adequately supervise and train the physicians, nurses, agents and employees who ordered MPA from NECC;

l. failed to implement or enforce policies and procedures that would prevent the procurement of purportedly sterile injectable medications from an out-of-state compounding pharmacy with deplorable sterility procedures, a checkered regulatory past, product recall problems, and a history of product liability suits;

m. facilitated or permitted the injection of steroids into the Plaintiffs without taking reasonable steps to ensure that those medicines were from a reputable supplier and were not contaminated with lethal pathogens;

n. approved, facilitated or permitted the purchase of MPA from NECC because it was less expensive than safer alternatives; and

51

o.   failed to promptly notify the Plaintiffs that they were injected with potentially contaminated steroids and failed to recommend that they receive prompt treatment of their potential fungal infections.

288. The person or persons who decided to procure MPA from NECC were employees or agents of Saint Thomas and were acting within the course and scope of their employment or agency. Accordingly, Saint Thomas is liable for the consequences of said person or persons' conduct pursuant to the doctrine of *respondeat superior*.

289. Saint Thomas Neurosurgical is the actual, ostensible, and apparent agent of Saint Thomas. Therefore, in addition to Saint Thomas being directly liable for its own conduct, it is also liable for the conduct of its agent, Saint Thomas Neurosurgical, under the doctrine of *respondeat superior* and under basic principles of agency.

290. Saint Thomas Neurosurgical is the agent of Saint Thomas because Saint Thomas Neurosurgical shares Saint Thomas' name, is located on Saint Thomas' campus and is operated in part by Saint Thomas. Saint Thomas handles Saint Thomas Neurosurgical's contracting and finances. Moreover, once the fungal meningitis outbreak occurred, Saint Thomas Neurosurgical instructed many patients to report to the St. Thomas Hospital emergency room for evaluation and treatment.

291. Saint Thomas Neurosurgical and Saint Thomas failed to maintain an arms-length relationship. Saint Thomas Neurosurgical is the alter ego of Saint Thomas.

292. Upon information and belief, Saint Thomas Neurosurgical is grossly under-capitalized and unable to meet its obligations to the victims of the fungal meningitis outbreak. Saint Thomas Neurosurgical was used as a business conduit designed to enrich Saint Thomas and Howell Allen Clinic while shifting the risk of devastating loss to innocent patients. To the extent that the fiction of a corporate veil exists at all around Saint Thomas Neurosurgical, justice and equity require that said veil be pierced.

52

## DAMAGES

293.    As a direct and proximate result of the Defendants' wrongful conduct as described above, the Plaintiffs have suffered physical injuries, physical and mental pain and suffering, mental anguish, loss of enjoyment of life and loss of earning capacity.

294.    The long term effects of the Plaintiffs' illnesses are unknown.

295.    Plaintiffs remain under the care of physicians and continue to incur medical and other expenses.

## PUNITIVE DAMAGES

296.    The above-described acts and omissions on the part of the Defendants were reckless and intentional.  Defendants were aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that their disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.  Plaintiffs, therefore, are entitled to an award of punitive damages against the Defendants.

## CAPS FOUND IN TENN. CODE ANN. § 29-39-102 AND § 29-39-104 ARE UNCONSTITUTIONAL AND VOID *AB INITIO*

297.    Plaintiffs seek a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the caps on personal injury and punitive damages set forth in Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are an unconstitutional deprivation of the right to trial by jury set forth in Article I, Section 6, of the Constitution of the State of Tennessee, which provides that the right of trial by jury shall remain inviolate, and violate the provisions of Article XI, Section 16, of the Constitution of the State of Tennessee which absolutely precludes the Legislature from exercising any legislative power to remove or restrict the right of juries in civil cases to determine damages.

53

298. On October 1, 2011, the Tennessee Civil Justice Act went into effect, enacting "caps" in all Tennessee personal injury cases for non-economic damages and punitive damages. Tenn. Code Ann. § 29-39-102; Tenn. Code Ann. § 29-39-104. Under that Act, Plaintiffs' non-economic damages are purportedly capped at $750,000, and their ability to recover punitive damages is capped at twice the compensatory damages up to a maximum of $500,000.

299. Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are unconstitutional deprivations of Plaintiffs' constitutionally protected right to trial by jury. Those provisions violate Article I, Section 6, of the Constitution of the State of Tennessee, which provides that the right of trial by jury shall remain inviolate. In addition, the subject statutory caps violate Article I, Section 17, of the Tennessee Constitution, which states that all courts shall be open, and every man shall have a remedy for injury done by due course of law and without denial or delay. The subject statutory caps usurp the powers of the Judicial Branch in violation of Article II, Sections 1 & 2 of the Tennessee Constitution. In addition, the subject statutory caps violate Article XI, Section 16, of the Tennessee Constitution which indicates that the rights of citizens articulated in Tennessee's Bill of Rights "shall never be violated on any pretense whatever . . . and shall forever remain inviolate."

300. Therefore, Plaintiffs request a declaration that the statutory caps are unconstitutional, void *ab initio*, and of no force and effect.

301. Pursuant to Tenn. Code Ann. § 29-14-107, a copy of this Complaint is being served on the Attorney General of the State of Tennessee, notifying the State of Tennessee Attorney General that Plaintiffs are challenging the constitutionality of Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104.

54

302.    Plaintiffs complied with the notice requirements of Tenn. Code Ann. §§ 29-26-121(a) and provided the required documentation specified in § 29-26-121(a)(2) to appropriate Defendants more than 60 days before the filing of the Complaint.

303.    Plaintiffs have demonstrated their compliance with the provisions of Tenn. Code Ann. §§ 29-26-121(a)(1), 29-26-121(a)(2), 29-26-121(a)(3)(B), 29-26-121(a)(4) and 29-26-121(b) as evidenced by the Affidavits included as Exhibits 7A - 7P (which is incorporated herein by reference), which establishes compliance with Tenn. Code Ann. § 29-26-121 and includes as attachments copies of the notices of claims, authorizations, and Certificates of Mailing from the United States Postal Service stamped with the date of mailing along with copies of the notices sent to each of the healthcare Defendants.

304.    With regard the healthcare Defendants, Saint Thomas Neurosurgical, Howell Allen Clinic, John Culclasure, M.D., Debra Schamberg, R.N., Saint Thomas West Hospital, formerly known as St. Thomas Hospital, Saint Thomas Network, and Saint Thomas Health, Plaintiffs complied with the requirements of Tenn. Code Ann. § 29-26-121(a) by sending notice of claim via certified mail, return receipt requested, at both the addresses listed for their agents for service of process and the providers' current business addresses. The dates the notices were mailed to each of the healthcare Defendants on behalf of each of the Plaintiffs are set forth in the Affidavits included as Exhibits 7A – 7P.

305.    The requirements of Tenn. Code Ann. § 29-26-121 have been satisfied.

306.    Pursuant to Tenn. Code Ann. § 29-26-122(a), a Certificate of Good Faith signed by the undersigned counsel is included as Exhibit 8 and incorporated herein by reference.

55

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Travis Besaw, Donna Branham, Ben Bratcher, Barbara Campbell, Theresa Carroll, Billy Joe Coleman, Danny Evans, Ellen Glatman, Dorris Jordan, Melanie Miller, Dorothy Naseef, Larry Ken Pierce, Melanie Stinson, Blake Taylor, Rondal Turner, and Krissy Wilkinson, request the following relief:

A.      A judgment to Travis Besaw for compensatory damages in the amount of $2,500,000.

B.      A judgment to Donna Branham for compensatory damages in the amount of $2,500,000.

C.      A judgment to Ben Bratcher for compensatory damages in the amount of $5,000,000.

D.      A judgment to Barbara Campbell for compensatory damages in the amount of $5,000,000.

E.      A judgment to Theresa Carroll for compensatory damages in the amount of $2,500,000.

F.      A judgment to Billy Joe Coleman for compensatory damages in the amount of $2,500,000.

G.      A judgment to Danny Evans for compensatory damages in the amount of $2,500,000.

H.      A judgment to Ellen Glatman for compensatory damages in the amount of $10,000,000.

I.      A judgment to Dorris Jordan for compensatory damages in the amount of $2,500,000.

56

J. A judgment to Melanie Miller for compensatory damages in the amount of $5,000,000.

K. A judgment to Dorothy Naseef for compensatory damages in the amount of $5,000,000.

L. A judgment to Larry Ken Pierce for compensatory damages in the amount of $10,000,000.

M. A judgment to Melanie Stinson for compensatory damages in the amount of $2,500,000.

N. A judgment to Blake Taylor for compensatory damages in the amount of $5,000,000.

O. A judgment to Rondal Turner for compensatory damages in the amount of $2,500,000.

P. A judgment to Krissy Wilkinson for compensatory damages in the amount of $2,500,000.

Q. A judgment to each Plaintiff for punitive damages in an amount to be determined by the trier of fact;

R. A declaration that the caps found in Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are unconstitutional under Article I, Section 6; Article I, Section 17; Article II, Sections 1 & 2; and/or Article XI, Section 16 of the Constitution of the State of Tennessee and are therefore void *ab initio* and of no force and effect;

S. A jury to determine all disputed factual issues;

T. For costs of this cause; and

U. For such further relief as the Court may deem just and proper.

57

Respectfully submitted,


ENGLISH, LUCAS, PRIEST & OWSLEY, LLP


/s/Kurt W. Maier

Kurt W. Maier Tenn. Sup. Crt. No. 14711
Robert A. Young (Tenn. Sup. Crt. No.28860)(Pro Hac Vice admission pending)
J. Kyle Roby (Pro Hac Vice admission pending)
1101 College St., P.O. Box 770
Bowling Green, KY 42101
Phone:  (270) 781-6500
Fax: (270) 782-7782
E-mail: kmaier@elpolaw.com
        byoung@elpolaw.com
        kroby@elpolaw.com


And


/s/ Larry L. Crain

Larry L. Crain
Tenn. Cup. Crt. No. 9040
Crain, Schuette & Associates, LLC
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Phone: (615) 376-2600
Fax: (615) 345-6009
E-mail: larry@csafirm.com